# United States Court of Appeals
## For the First Circuit

No. 17-1256

KATHRINE MAE MCKEE,

Plaintiff, Appellant,

v.

WILLIAM H. COSBY, JR.,

Defendant, Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Mark G. Mastroianni, U.S. District Judge]

Before

Lynch, Stahl, and Thompson,
Circuit Judges.

F. William Salo for appellant.
Alan A. Greenberg, with whom Angela Agrusa and Liner LLP were
on brief, for appellee.

October 18, 2017

**LYNCH**, **Circuit Judge**.  Kathrine McKee sued William H. Cosby, Jr., whom she had accused in a 2014 interview published in the New York Daily News of raping her, for defamation after the content of a purportedly confidential letter penned to the paper by Cosby's attorney in Cosby's defense was disseminated and reported on by news outlets and websites worldwide.  The district court granted Cosby's motion to dismiss, primarily on First Amendment grounds, see McKee v. Cosby, 236 F. Supp. 3d 427 (D. Mass. 2017), and McKee appealed.  We affirm.

I.

We accept as true the well-pleaded factual allegations from McKee's amended complaint and draw all reasonable inferences in McKee's favor.  See Stanton v. Metro Corp., 438 F.3d 119, 123 (1st Cir. 2006).  McKee is a performer and actress who has been working in the entertainment industry for over fifty years.  Cosby is an internationally renowned celebrity and entertainer.  McKee met Cosby around 1964, while she was a showgirl in Las Vegas.  In 1971, McKee appeared as an actress on the "Bill Cosby Show," and then socialized with Cosby and his wife on several occasions between 1971 and 1974.  In 1974, Cosby invited McKee to meet him in his hotel room in Detroit, Michigan, before heading out to a party.  Immediately after McKee arrived and entered the hotel room, Cosby forcibly raped her.

In December 2014, after more than twenty other women had publicly accused Cosby of sexual assault, McKee revealed the rape during an interview with Nancy Dillon, a reporter for the New York Daily News. On December 22, 2014, the Daily News published an article describing the rape as McKee had recounted it. Later that same day, Cosby's attorney, Martin Singer, e-mailed a six-page letter to the Daily News' New York office, addressing the article (the "Singer Letter" or "Letter").

The Singer Letter, which bears prominent "Confidential Legal Notice" and "Publication or Dissemination Is Prohibited" disclaimers on its front page, admonishes the Daily News for its decision to publish an article disclosing McKee's rape allegations against Cosby. The Letter asserts repeatedly that the newspaper "maintains virtually no journalistic standard[s] or credibility threshold" for its stories, as illustrated by its willingness to publish McKee's "never-before-heard tale" while deliberately ignoring or inexcusably failing to investigate "[a]mple . . . readily available" "evidence undermining [McKee's] reliability." Referencing "[e]asily available public information" that "belie[s] the Daily News' Story" and demonstrates that McKee's rape "story lacks credibility," the Letter lists, in a string of bullet points, statements that McKee allegedly made pertaining to her social relationship with Cosby, as well as her past life as a Las Vegas showgirl. Each set of attributed statements is accompanied by a

footnote with a citation to a news article or other source. Then, asserting that "the Daily News is not alone," the Letter goes on to more broadly bemoan the "reckless[ness]" of "irresponsible media" that "blindly ignores the dubious background of sources," including inter alia the "[c]riminal backgrounds of various accusers." In closing, the Letter demands "[p]ublication of a retraction and correction" of the Daily News' "malicious defamatory article."

According to McKee, on the same day Singer sent the Letter to the Daily News, he leaked copies of it to the media. Within hours, excerpts and quotes appeared in news outlets around the world and were further reported on by various news organizations and websites. McKee alleges that the rapid and widespread dissemination of the statements contained in the Letter defamed her, causing harm to her reputation nationally within "days, weeks or even months."

In December 2015, McKee sued Cosby for defamation in federal court in Massachusetts, invoking diversity jurisdiction. In July 2016, McKee filed an amended complaint in which she asserted twenty-four defamation counts pertaining to various portions of the Singer Letter. Cosby moved to dismiss McKee's amended complaint for failure to state a claim. In February 2017, the district court granted Cosby's motion. See McKee, 236 F. Supp. 3d at 454. The court held that the "gist" of the Letter was

- 4 -

the author's opinion that McKee lacked credibility and that the Daily News improperly ignored or failed to investigate publicly available information undermining her rape allegations. Id. at 439-40. The court deemed non-actionable the opinion as to McKee's credibility because it was "not capable of being objectively verified or disproven" and, in any event, the Letter "adequately disclosed the non-defamatory facts underlying the opinion[]." Id. at 440. The court then individually addressed each of the allegedly false and defamatory statements singled out in the twenty-four counts of McKee's complaint, and found all of them to be non-actionable under First Amendment principles and/or under Michigan defamation law. See id. at 444-54. McKee appeals from entry of judgment against her, arguing that her claims should go to trial.

## II.

We review de novo the district court's grant of a motion to dismiss a defamation suit. Stanton, 438 F.3d at 123. We accept as true the complaint's well-pleaded factual allegations, and draw all reasonable inferences in favor of the non-moving party. Id. Before turning to the merits, we describe the applicable law that will guide our analysis, and address lingering disputes about that law.

- 5 -

A.    Choice of Law

The parties disagree as to which state's defamation law should apply.  McKee advocates for the law of Massachusetts, asserting that Massachusetts has "the most compelling interest in this action."  Cosby maintains that "either Michigan or Nevada law applies," emphasizing that although McKee was living in Michigan at the time the Singer Letter was published and its allegedly defamatory content disseminated, she later moved to Nevada.  The district court applied Michigan law, and did not err in doing so.

In deciding which state's substantive law applies, federal courts follow the forum state's choice of law rules.  In re Volkswagen & Audi Warranty Extension Litig., 692 F.3d 4, 14 (1st Cir. 2012).  In Massachusetts, courts resolve choice-of-law questions "'by assessing various choice-influencing considerations,' including those provided in the Restatement (Second) of Conflict of Laws (1971)."  Cosme v. Whitin Mach. Works, Inc., 632 N.E.2d 832, 834 (Mass. 1994) (citation omitted) (quoting Bushkin Assocs. v. Raytheon Co., 473 N.E.2d 662, 668 (Mass. 1985)); see also Bushkin, 473 N.E.2d at 669 (treating the Restatement as an "obvious source of guidance" for choice of law questions).  When a defamatory statement is published in multiple states, the Restatement applies the law of the state with the "most significant relationship to the occurrence and the parties," Restatement (Second) of Conflict of Laws § 150(1) (1971), which "will usually

be the state where the [defamed] person was domiciled at the time, if the matter complained of was published in that state," id. § 150(2).

Almost immediately after Singer emailed the Letter to the Daily News in New York on December 22, 2014, its content was disseminated and reported on by news outlets nationally and "around the world," causing, McKee alleges, reputational harm in all fifty states within "days, weeks, or even months." At that time, McKee's state of domicile was Michigan. McKee resided in Michigan from 1994 until July 2015. McKee alleges in her brief that she "incurred damages for personal humiliation, mental anguish and suffering in Michigan" from December 22, 2014 through July 2015. To be sure, other states are also implicated in this case in one way or another: the Letter was initially sent to the Daily News in New York; McKee permanently moved to Nevada approximately six months after the Letter was published; and Cosby was domiciled in Massachusetts when the Letter was written. But we agree with the district court that the state with the "most significant" relationship to this suit is that in which McKee resided when the Letter was published and for decades preceding the alleged "impairment of [her] reputation and standing in the community," Gertz v. Robert Welch, Inc., 418 U.S. 323, 350 (1974). Since Michigan was McKee's longstanding state of domicile when she was

allegedly defamed, the district court soundly chose to apply Michigan law.

B.     Legal Principles

Under Michigan law, the elements of a defamation claim are:

> (1) a false and defamatory statement concerning the plaintiff, (2) an unprivileged communication to a third party, (3) fault amounting at least to negligence on the part of the publisher, and (4) either actionability of the statement irrespective of special harm (defamation per se) or the existence of special harm caused by publication.

Mitan v. Campbell, 706 N.W.2d 420, 421 (Mich. 2005) (citations omitted).  A statement is "defamatory" if "it tends to lower an individual's reputation in the community or deters third persons from associating or dealing with that individual."  Ireland v. Edwards, 584 N.W.2d 632, 636 (Mich. App. Ct. 1998) (citation omitted).

Superimposed on any state's defamation law are First Amendment safeguards.  See Pan Am Sys., Inc. v. Atl. Ne. Rails & Ports, Inc., 804 F.3d 59, 64 (1st Cir. 2015) ("Modern defamation law is a complex mixture of common-law rules and constitutional doctrines.").  We highlight here the most relevant principles.

First, "defamatory statements are not punishable unless they are capable of being proved true or false."  Pan Am Sys., 804 F.3d at 65.  There is no "wholesale defamation exemption for

- 8 -

anything that might be labeled 'opinion.'" Milkovitch v. Lorain Journal Co., 497 U.S. 1, 18 (1990); see also id. at 19 (declining to create an "artificial dichotomy between 'opinion' and fact"). The critical question is whether the challenged statement "reasonably would be understood to declare or imply provable assertions of fact." Phantom Touring, Inc. v. Affiliated Publ'ns, 953 F.2d 724, 727 (1st Cir. 1992). A statement, even if "couch[ed] . . . as an opinion," will give rise to liability if it "implies the existence of underlying [false and] defamatory facts" as its basis; conversely, a statement is "immunize[d]" so long as the speaker discloses all of the facts undergirding it and none of them are both false and defamatory. Piccone v. Bartels, 785 F.3d 766, 771 (1st Cir. 2015). In other words, when the speaker "outlines the facts available to him, thus making it clear that the challenged statements represent his own interpretation of those facts and leaving the reader free to draw his own conclusions, those statements are generally protected by the First Amendment." Riley v. Harr, 292 F.3d 282, 289 (1st Cir. 2002) (quoting Partington v. Bugliosi, 56 F.3d 1147, 1156-57 (9th Cir. 1995)). "[E]ven a provably false statement is not actionable if 'it is plain that the speaker is expressing a subjective view . . . rather than claiming to be in possession of objectively verifiable facts.'" Id. (quoting Gray v. St. Martin's Press, Inc., 221 F.3d 243, 248 (1st Cir. 2000)).

Second, if the plaintiff is either a public official or a public figure, he or she may not recover damages for a defamatory statement unless he or she can prove that the statement was made with "'actual malice' -- that is, with knowledge that it was false or with reckless disregard of whether it was false or not." N.Y. Times Co. v. Sullivan, 376 U.S. 254, 279-80 (1964). Public-figure status can arise in one of two ways. An individual becomes a "general-purpose" public figure if he "achieve[s] such pervasive fame or notoriety that he becomes a public figure for all purposes and in all contexts." Gertz, 418 U.S. at 351; Lluberes v. Uncommon Prods., LLC, 663 F.3d 6, 13 (1st Cir. 2011). Alternatively, an individual becomes a "limited-purpose" public figure if he "voluntarily injects himself or is drawn into a particular public controversy and thereby becomes a public figure for a limited range of issues," the scope of which is determined by the "nature and extent of [his] participation in the particular controversy giving rise to the defamation." Gertz, 418 U.S. at 351-52; Lluberes, 663 F.3d at 13. Either way, a public-figure plaintiff bears the "heavy, and often insurmountable" burden of proving that the defendant acted with "actual malice." Lluberes, 663 F.3d at 14.

McKee argues that the district court erred when it found her to be a limited-purpose public figure with respect to "the public controversy over [Cosby's] alleged sexual assault of

- 10 -

[McKee] and others." McKee, 236 F. Supp. 3d at 453 n.25. There was no error.

The critical questions for limited-purpose public figure status are whether a matter of "public controversy" existed prior to the alleged defamation, and whether the defamed individual deliberately "thrust [herself] into the vortex" of that controversy or otherwise "engage[d] the public's attention in an attempt to influence its outcome." Gertz, 418 U.S. at 351-52; see also Bruno & Stillman, Inc. v. Globe Newspaper Co., 633 F.3d 583, 590-91 (1st Cir. 1980). While ascertaining public-figure status may in some cases require a "detailed fact-sensitive determination," Penobscot Indian Nation v. Key Bank, 112 F.3d 538, 561 (1st Cir. 1997), the matter is resolved as a question of law, Pendleton v. City of Haverhill, 156 F.3d 57, 68 (1st Cir. 1998), and when possible, it is "perfectly reasonable to . . . decide whether a plaintiff is a . . . public figure during pretrial proceedings." Mandel v. Bos. Phx., Inc., 456 F.3d 198, 204 (1st Cir. 2006).

In our case, the web of sexual assault allegations implicating Cosby, an internationally renowned comedian commonly referred to as "America's Dad," constitutes a public controversy. McKee portrays her dispute with Cosby as a self-contained, private dispute -- "purely a matter of private concern" -- and argues that "Cosby's alleged criminal behavior has not become a matter of

- 11 -

'public controversy.'" Cf. Time, Inc. v. Firestone, 424 U.S. 448, 454 (1976) (finding private high-society divorce proceeding was not a "public controversy" despite being a "cause célèbre" in the media). However, the context in which McKee decided to reveal her rape to the press in December 2014, following decades of silence, belies this narrative: McKee came forward after more than twenty other women had levelled highly publicized sexual assault accusations against Cosby, who in response allegedly hired a team of lawyers and investigators "to discredit them, to intimidate them, and to intimidate any future would-be accusers."

By purposefully disclosing to the public her own rape accusation against Cosby via an interview with a reporter, McKee "thrust" herself to the "forefront" of this controversy, seeking to "influence its outcome." Gertz, 418 U.S. at 345; see also Street v. Nat'l Broad. Co., 645 F.2d 1227, 1235 (6th Cir. 1981), cert. granted, 454 U.S. 815 (1981), and cert. dismissed, 454 U.S. 1095 (1981) (sexual assault plaintiff who "gave press interviews and aggressively promoted her version of the case outside of her actual courtroom testimony" was a public figure because she "had effective access to the media and encouraged public interest in herself"). McKee points out that "[a] private individual is not automatically transformed into a public figure just by becoming involved in or associated with a matter that attracts public attention." Wolston v. Reader's Digest Ass'n, 443 U.S. 157, 167

- 12 -

(1979).  But in stark contrast to the plaintiff in Wolston, who was "dragged unwillingly into the controversy," id. at 166, and "never discussed th[e] matter with the press," id. at 167, McKee deliberately came forward and accused Cosby of rape in an interview with a reporter, thereby engaging the public's attention and "invit[ing] public scrutiny" of the credibility of her allegations.  Pendleton, 156 F.3d at 69.  In other words, McKee took concerted steps meant to influence the public's perception of whether Cosby was, in fact, a sexual predator.  For these reasons, we hold as a matter of law that McKee is a limited-purpose public figure.  As a result, to the extent any statements made in the Singer Letter meet the tests for falsity and for defamation, McKee bears the burden of plausibly alleging that Cosby made such statements with either "knowledge" that they were false or "reckless disregard" for their truth or falsity.  Sullivan, 376 U.S. at 279-80.

C.  Analysis

We apply the above rules to the pleading here.  We focus first on the message of the Singer Letter as a whole, before considering individual statements McKee has challenged.  From McKee's perspective, Singer, acting on Cosby's behalf, crafted the Letter to "communicate to the world the defamatory message that Ms. McKee is a liar with regard to the Cosby rape allegation"; the Letter's "sting" is that "McKee's rape allegation is false."

- 13 -

According to Cosby, the Letter focused instead "on the conduct of the Daily News, not McKee," and was meant to "criticize[] the media generally and the Daily News specifically" for their low journalistic standards and failure to properly vet their sources. It is fair to say the Letter does both. It "raises doubts as to [McKee's] credibility and castigates the Daily News" for failing to acknowledge readily available evidence that undermined McKee's reliability. McKee, 236 F. Supp. 3d at 443.

It is manifest from the face of the Singer Letter that its purpose is to undermine McKee's credibility, not merely to lambast the Daily News. The Letter is replete with assertions and innuendo leading to the conclusion that McKee is not credible: "To say that Ms. McKee is not a reliable source is a gross understatement"; "The glaring inconsistently [sic] . . . was alone a basis to question [McKee's] veracity and render her an unreliable source"; "Ms. McKee has admitted, 'I had to do a lot of lying.'" General statements about a person's credibility may well be a matter of opinion that is not capable of being "objectively verified or disproven." McKee, 236 F. Supp. 3d at 440. Assessing credibility requires "a quintessential 'expression[] of personal judgment'" that is "subjective in character." Piccone, 785 F.3d at 772 (quoting Gray v. St. Martin's Press, Inc., 221 F.3d 243, 248 (1st Cir. 2000)).

- 14 -

With that being said, the Singer Letter does more than merely attack McKee's credibility generally. The Letter implies that McKee's allegations of rape are not credible. Referring to the Daily News article containing "McKee's . . . allegations . . . accusing [Cosby] of rape," the Letter asserts that McKee's "story lacks credibility," that her "never-before-heard tale . . . is completely contradicted by her own prior published statements," and that "[a]mple published information . . . completely undermines [her] story." In addition, the bulk of the factual information and quotations highlighted in the Letter relate to the nature of McKee's relationship with Cosby and the plausibility of the rape allegation, rather than McKee's alleged general propensity to lie. All in all, the Letter says not only that McKee lacks credibility, but also that her rape "tale" is not credible.

Nevertheless, even if we treat the Singer Letter as asserting both that McKee lacks credibility and that McKee's rape allegations are not truthful, Singer adequately disclosed the non-defamatory facts underlying these assertions, thereby immunizing them from defamation liability. See McKee, 236 F. Supp. 3d at 440; see also Hill, 665 F. App'x at 175 ("[E]ven if Singer's Statement does imply Ms. Hill is a liar, it is still not actionable because it includes the facts supporting that implication." (alteration in original)). The Letter is "heavily footnoted with

- 15 -

citations to articles and other sources," "detail[ing] extensive underlying facts" as support for the author's assertions as to McKee's lack of credibility. McKee, 236 F. Supp. 3d at 440, 442. Whether we deem these underlying facts to be probative is immaterial, so long as the facts presented for the readers' consideration are not both false and defamatory. See Yohe v. Nugent, 321 F.3d 35, 42 (1st Cir. 2003).

McKee posits that a reader would infer that Singer was basing his assertions about McKee's credibility on knowledge of undisclosed facts. Nothing in the Singer Letter warrants such an inference. To the contrary, the Letter details upfront, in multiple bullet points footnoted with citations and hyperlinks to the underlying sources, the "published information" that, according to the view expressed in the Letter, undermines the credibility of McKee's allegations. As the Letter is "based on facts accessible to everyone," a reasonable reader would not understand Singer "to be suggesting that he was singularly capable of evaluating" McKee's credibility based on undisclosed evidence. Phantom Touring, 953 F.2d at 730-31. Rather, the reader can "draw [his] own conclusions" from the information provided. Id. at 731. McKee argues that the Letter should have provided a more "balanced two-sided story," as the defendant had arguably done in Phantom Touring, but there is no such requirement in the law.

- 16 -

We turn to McKee's individual counts of defamation. The bulk of the statements McKee challenges as defamatory declare that McKee generally, and her rape allegations in particular, lack credibility. Our analysis thus far forecloses these claims.

However, McKee also makes a different claim -- that the Singer Letter attributes statements to her that she says she did not make and that portray her in a bad light. In a few instances, McKee claims that the Letter deliberately misquotes or misconstrues her, with defamatory effect. Most serious is her argument that the Letter asserts that "Ms. McKee has admitted, 'I had to do a lot of lying' and 'lies landed her a job' as a Vegas showgirl," citing an article published by C&G Newspapers in 2010. McKee denies she ever made the statement attributed to her and alleges that the Letter quotes the C&G article "out of context" in order to falsely portray McKee as a "liar for pecuniary gain." She emphasizes that the C&G article was actually "referring to the fact that she was forced to conceal her mixed-race parentage in order to 'pass' for white in order to be a showgirl in the racist and segregationist atmosphere of 1960's Las Vegas." Singer admittedly does not include this important contextual information in the Letter itself, but the quotations, themselves accurate, are immediately followed by a hyperlink to the source article, allowing readers to put McKee's statements into proper context. On these

- 17 -

facts, we cannot conclude that Singer knowingly or recklessly published a falsehood.

In other instances, McKee claims that the Singer Letter mischaracterizes actions she took or statements she made, but does not contend that she never took the actions or made the statements. For example, she challenges the statement that she "liked" one of Cosby's comedy videos online and "posted a fond message" without denying that she actually "liked" the video or posted the message. Singer's "subjective characterizations" of otherwise accurately reported actions or statements are not capable of being proven true or false. McKee, 236 F. Supp. 3d at 447, 453.

In yet other instances, McKee claims that the Singer Letter misleadingly uses statements to imply that she was an unchaste woman. For example, the Letter quotes McKee as having said that "it was very common to be in and out of affairs," and her sister as having said that McKee was "always wild" and "always doing inappropriate things." The Letter provides links to the articles from which these quotes are drawn, enabling readers to examine the sources for themselves and consider the comments in context. These statements are not actionable.

Lastly, McKee claims that the Singer Letter deliberately (and falsely) implies that she has a criminal record. After detailing evidence "ignored" by the Daily News allegedly demonstrating that McKee's allegations are not credible, the

Letter states that "the Daily News is not alone" in its failure to apply "credibility threshold[s]." The Letter goes on to bemoan how "[t]he media has consistently refused to look into or publish information about various women whose stories are contradicted by their own conduct or statements," and has thereby "routinely ignored relevant information including: . . . [c]riminal backgrounds of various accusers, . . . [i]nformation from third party sources disputing the credibility of sources . . . [and] [i]ndependent evidence proving accusations impossible." The Letter adds that "the media's approach is to publish virtually any tale 'no questions asked' told by anyone willing to vouch for it, without questioning their motivations, their pasts, or even the criminal records of some accusers."

It is clear from the language and context of these statements that they are not about McKee. Rather than specifically criticize the Daily News for its publication of McKee's story, they express generalized grievances about the media as a whole for publishing allegations by other women against Cosby. The Singer Letter refers to "various women" whose accusations are contradicted by various types of information, and mentions that a subset of those women -- "some accusers" -- have criminal records. It neither states nor implies that McKee herself has a criminal record. Because the challenged statements do not "concern" McKee, they are not actionable. See Curtis v. Evening News Ass'n, 352

N.W.2d 355, 356 (Mich. Ct. App. 1984) (to succeed on claim for defamation, plaintiff must prove statement is "concerning" him).

## III.

For the foregoing reasons, we <u>affirm</u> the district court's order dismissing all counts of McKee's amended complaint.